## UNITED STATES DISTRICT COURT FOR THE
## WESTERN DISTRICT OF MISSOURI
## CENTRAL DIVISON

BRENT BLACK

          Petitioner,

      v.

DORIS FALKENRATH,

          Respondent.

Case No. 2:21-4207-NKL

## **ORDER**

Before the Court is Petitioner Brent Black's petition for a writ of habeas corpus. Doc. 1. Mr. Black was convicted for child abuse in the first degree and murder in the second degree in Pulaski County, Missouri. While Mr. Black originally pursued four theories of habeas relief before this Court, the only one that remains is his claim that his lawyer in his state criminal trial was ineffective for failing to request a jury instruction for the lesser included offense of involuntary manslaughter in the first degree.[1]

The Court previously ordered that an evidentiary hearing was needed to resolve Mr. Black's procedural default. *See* Doc. 19. However, after the Supreme Court decision in *Shinn v. Ramirez*, 142 S. Ct. 1718 (2022), this Court ordered briefing on whether the evidentiary hearing could proceed, and if the Court could grant Mr. Black's claim without an evidentiary hearing. Doc. 24. For the reasons discussed below, the Court concludes that it may not hold an evidentiary hearing on the merits of Mr. Black's ineffective assistance of counsel claim; Mr. Black is limited

---

[1] All other claims were previously dismissed by this Court. *See* Doc. 19.

to the evidence in the state court record. Looking to that evidence, Mr. Black's claim of ineffective assistance of trial counsel fails, and his writ of habeas corpus is DENIED.

## I.   BACKGROUND

The Court previously provided a detailed background. *See* Doc. 19, at 1–5. What follows are only the facts relevant to Mr. Black's remaining theory of habeas relief.

### A.  Underlying Facts

Mr. Black's girlfriend ("B.G.") had a child ("S.G.") from a previous relationship. On January 25, 2013, S.G.'s biological father returned S.G. to Mr. Black and B.G. around 7:00 pm. After S.G. and B.G. went to sleep, Mr. Black stayed awake watching television.

Mr. Black told the Rolla Police that, at about two in the morning, he heard S.G. crying. He gave her a bottle, changed her diaper, and laid her back down in the crib. After another hour, Mr. Black heard S.G. making some babbling sounds and coughing, but he was not concerned because she had a cold when she returned from her biological father's. When Mr. Black checked on S.G. a few minutes later, her face was blue. He checked to see if there was anything in her mouth. While he could not see anything, he felt an object with his finger. He unsuccessfully tried to remove the object with his finger, and then ultimately removed a baby wipe from her throat with pliers. After unsuccessfully trying CPR, Mr. Black carried S.G. to B.G. Mr. Black tripped while carrying S.G. to B.G., and fell to the ground with S.G. in his arms. Mr. Black yelled to wake up B.G. and called 911 from a neighbor's apartment.

First responders arrived and found that S.G. was not breathing and had no pulse. A paramedic intubated S.G. First responders noted a large bruise on S.G.'s forehead. S.G. was admitted to Children's Mercy Hospital and provided life support. After an examination indicated S.G. was brain dead, her life support was removed. S.G. died on January 28, 2013.

**B. Trial**

Mr. Black was charged with child abuse in the first degree and murder in the second degree for killing S.G. through the commission of a felony. Two experts supported the prosecution. Dr. Atzemis, a consultant with experience in child abuse cases, reviewed hospital records, spoke to medical providers, and physically examined S.G before S.G.'s death. Dr. Atzemis observed multiple bruises on S.G.'s head and face. Dr. Atzemis opined that S.G.'s injuries were most likely the result of abusive head trauma caused by another person. Dr. Atzemis "wouldn't expect" the injuries to form because of a child being held by an adult falling onto a tile floor or by the lack of oxygen due to choking on a baby wipe. Furthermore, after S.G.'s death, Dr. Case, a medical examiner, performed an autopsy. Dr. Case testified that the injuries would have immediately knocked S.G. unconscious, and that S.G. died from head injuries caused by multiple non-accidental impacts.

Mr. Black's case was supported by the testimony of Dr. Young, a forensic pathologist and former medical examiner serving the Kansas City metropolitan area. Dr. Young testified that the medical evidence suggested that S.G.'s death was caused by a lack of oxygen to the brain, and overall concluded that S.G.'s injuries were consistent with Mr. Black's testimony.

The jury deliberated for approximately seven and a half hours. Twice during the deliberations, the jury indicated they were at an impasse and asked what to do. During deliberations the jury asked: (1) "[w]hat is the definition of murder in the second degree?"; (2) "[c]an we agree to a lesser charge?" The Judge responded, "[t]he definition of murder in the second degree is contained in Instruction No. 7. You are to consider the [i]nstructions only as provided." The jury found Black guilty of both counts. He was sentenced to consecutive terms of 12 years for child abuse in the first degree and life imprisonment for murder in the second degree.

### C. Appellate History

Mr. Black filed a direct appeal, and the Missouri Court of Appeals affirmed his conviction and sentence. Mr. Black then filed a timely *pro se* motion for post-conviction relief under Missouri Supreme Court Rule 29.15 in the trial court. Mr. Black's post-conviction counsel argued that his trial counsel was ineffective for a variety of reasons, but he did not argue that his trial counsel was ineffective for failing to request an instruction for involuntary manslaughter in the first degree. Mr. Black appealed the denial of his post-conviction motion to the Missouri Court of Appeals, which affirmed the motion court's ruling.

### D. Habeas Petition

In Mr. Black's original writ for habeas corpus, he made five claims: (1) his trial counsel was ineffective for failing to submit a jury instruction for the lesser included offense of involuntary manslaughter in the first degree; (2) his trial counsel was ineffective for failing to present available evidence that S.G. was abused by her biological father; (3) his trial counsel was ineffective in failing to adequately cross-examine B.G.; (4) his trial counsel was ineffective for failing to object to Dr. Case's testimony; and (5) he was denied due process by the trial court's decision to submit a "hammer" instruction to the jury. Only Mr. Black's first claim remains pending before the Court.

Mr. Black supported his first claim by alleging that the jury was presented with an "all or nothing" choice, which was unreasonable given the strength of the prosecution's case, and if presented with an involuntary manslaughter instruction, there is a reasonable probability that the jury would have convicted Mr. Black of involuntary manslaughter, rather than murder in the second degree. Mr. Black highlights that the jury asked during deliberations if they could convict Mr. Black on a lesser charge.

### E. Court's Prior Orders

On May 16, 2022, this Court denied claims 2–5 of Mr. Black's habeas petition because Mr. Black could not show that the previous state court denials of these claims were "contrary to, or involved an unreasonable application of, federal law or resulted in a decision that was based on an unreasonable determination of the facts." Doc. 19, at 6. But the Court granted Mr. Black's request for an evidentiary hearing on claim 1. The Court determined that (1) the claim was procedurally defaulted; (2) Mr. Black had made sufficient allegation in his *pro se* petition that his procedural default should be excused under *Martinez v. Ryan*, 566 U.S. 1 (2012); (3) despite *Arnold v. Dormire*, 675 F.3d 1081 (8th Cir. 2012), Mr. Black could make a claim for ineffective assistance of counsel based on the failure to request a lesser included instruction; and (4) an evidentiary hearing was needed. Doc. 19, at 12.

After this Court's Order, the Supreme Court decided *Shinn v. Ramirez*. 142 S. Ct. 1718 (2022). The Court then ordered the Parties to brief whether the Court could still hold an evidentiary hearing after *Shinn* and, if not, whether the Court could grant habeas relief based on the current record. After reviewing the Parties' briefs, the Court held oral argument on the merits of Mr. Black's ineffective assistance claim.

## II.  LEGAL STANDARD

"The writ of habeas corpus stands as a safeguard against imprisonment of those held in violation of the law." *Harrington v. Richter*, 562 U.S. 86, 91 (2011). "In general, if a convicted state criminal defendant can show a federal habeas court that his conviction rests upon a violation of the Federal Constitution, he may well obtain a writ of habeas corpus that requires a new trial, a new sentence, or release." *Trevino v. Thaler*, 569 U.S. 413, 421 (2013). The Anti-Terrorism and Effective Death Penalty Act of 1996, 28 U.S.C. § 2254 ("AEDPA"), applies to all petitions for

habeas relief filed by state prisoners after it's effective date, April 24, 1996. *Lindh v. Murphy*, 521 U.S. 320, 326–29 (1997). A habeas petitioner must "fairly present" his or her claims in state court before seeking habeas relief in federal court. *See Murphy v. King*, 652 F.3d 845, 848-49 (8th Cir. 2011); *see also* 28 U.S.C. § 2254(b)(1)(A) ("An application for a writ of habeas corpus . . . shall not be granted unless it appears that the applicant has exhausted the remedies available in the courts of the State"). When a petitioner fails to fully exhaust his claims in state court, and the time to do so has passed, the petitioner's claims are procedurally defaulted. *See Coleman v. Thompson*, 501 U.S. 722, 731–32 (1991).

It is undisputed that Mr. Black's claim is procedurally defaulted because it was not raised in his post-conviction relief motion.[2] Normally, the Court must dismiss a procedurally defaulted claim. *Beaulieu v. Minnesota,* 583 F.3d 570, 573 (8th Cir. 2009) (citation omitted). However, a petitioner may overcome procedural default if he can demonstrate "cause" to excuse the procedural defect and "actual prejudice." *Martinez*, 566 U.S. at 10 (citing *Coleman,* 501 U.S. at 750).

Typically, the mistakes of counsel will not suffice to establish cause to excuse a procedural default. *Coleman*, 501 U.S. at 753. However, a limited exception exists when a petitioner also suffered defective assistance of post-conviction counsel, and the post-conviction proceeding was the first opportunity the petitioner had to raise the ineffective assistance of trial counsel. *Harris v. Wallace*, 984 F.3d 641, 648 (8th Cir. 2021) (citations omitted); *see also Martinez*, 566 U.S. at 14. Thus, for a federal habeas court to consider Mr. Black's claim of ineffective assistance of *trial* counsel, he must also prove that his *post-conviction* counsel was constitutionally defective. This

---

[2] In Missouri, claims of ineffective assistance of trial counsel must be brought through a Rule 29.15 motion for post-conviction relief and maintained throughout the state appellate process. Mo. Sup. Ct. Rule 29.15(a); s*ee also Arnold v. Dormire*, 675 F.3d 1082, 1087 (8th Cir. 2012). Accordingly, it cannot be raised during a direct appeal. *Marcyniuk v. Payne*, 39 F.4th 988, 995–96 (8th Cir. 2022).

is colloquially called a *Martinez* claim. To prove a *Martinez* claim, Mr. Black must show "(1) the claim of ineffective assistance of trial counsel was a "substantial" claim; (2) the "cause" amounted to there being "no counsel" or only "ineffective" counsel during the state collateral review proceeding; and (3) the state collateral review proceeding was the "initial" review proceeding with respect to the ineffective-assistance-of-trial-counsel claim. *Marcyniuk v. Payne*, 39 F.4th 988, 995–96 (8th Cir. 2022) (citation omitted). The Court looks to the familiar *Strickland* standard to evaluate the performance of both trial and post-conviction counsel. *Martinez*, 566 U.S. at 14. This means that to show ineffective assistance of counsel in violation of the Sixth Amendment, Mr. Black must demonstrate both that his lawyers' performance was unreasonable and that he was prejudiced by his lawyer's unreasonable performance. *Id.*

## III. DISCUSSION

### A. Whether Mr. Black Is Entitled to an Evidentiary Hearing to Develop His Claims

This Court previously determined that Mr. Black was entitled to an evidentiary hearing to further develop both his underlying ineffective trial counsel claim and his claim that *Martinez* excused his procedural default. *See generally* Doc. 19, at 6–12. Then the Supreme Court decided *Shinn v. Ramirez*, which severely limited the availability of evidentiary hearings in claims like Mr. Black's. 142 S.Ct. 1718 (2022).

28 U.S.C. § 2254(e) governs a federal court's ability to review a state court's factual findings or supplement the state court's factual record. Generally, "in a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct." 28 U.S.C. § 2254(e)(1). And "if the applicant has failed to develop the factual basis of a claim in State court proceedings, [a federal court] shall not hold an evidentiary hearing on the

claim" unless either of two narrow exceptions—not argued here—apply. 28 U.S.C. § 2254(e)(2). For habeas petitioner to have "failed" to develop the record, and therefore for the statute to apply, the petitioner must be "at fault" for the undeveloped record. *Shinn*, 142 S. Ct. at 1734 (citation omitted). Prior to *Shinn*, the Eighth Circuit, and indeed courts across the country, held that § 2254(e)(2) did not apply to bar a petitioner from holding an evidentiary hearing to develop his underlying claim of ineffective trial counsel and that *Martinez* excused any procedural default. *E.g., Sasser v. Hobbs*, 735 F.3d 833, 853-54 (8th Cir. 2013). This is because, in *Martinez* cases, the petitioner was not "at fault" for any failure to develop the record.

However, in *Shinn*, the Supreme Court held that "under § 2254(e)(2), a federal habeas court may not conduct an evidentiary hearing or otherwise consider evidence beyond the state-court record based on ineffective assistance of state post-conviction counsel" because "a state prisoner is responsible for counsel's negligent failure to develop the state postconviction record." 142 S. Ct. at 1734. Thus, while under *Martinez* a habeas petitioner is not "at fault" for failing to *raise* an ineffective assistance of trial counsel claim in state post-conviction proceedings, *Shinn* effectively holds that a petitioner is at fault for failing to *develop the record* for that claim before the state court. Accordingly, "a federal court may order an evidentiary hearing or otherwise expand the state-court record only if [a habeas petitioner] can satisfy § 2254(e)(2)'s stringent requirements." *Marcyniuk*, 39 F.4th at 999

Mr. Black concedes that post-*Shinn,* he cannot further develop the record to support his underlying claim of ineffective assistance of trial counsel. However, he argues that he can still have a limited hearing to establish that *Martinez* applies. But any Martinez hearing could only be used to develop the factual record to show cause for a procedural default, not to develop the factual record to support Mr. Black's claim that his trial counsel was ineffective. *Shinn*, 142 S. Ct. at 1738

("There are good reasons to doubt respondents' first point [that an evidentiary hearing to establish cause and prejudice is not a hearing "on the claim"], but we need not address it because our precedent squarely forecloses the second [that a petitioner could use evidence from an evidentiary hearing to establish the merits of an ineffective assistance of counsel claim].").  Further, the Supreme Court has directed lower courts not to hold evidentiary hearings when doing so would needlessly prolong habeas proceedings, *Id.*, at 1739.  In response to that directive, lower courts have reordered the traditional habeas analysis in *Martinez* claims: first, courts determine whether, looking only to the state court record, there is sufficient evidence to establish the petitioner's underlying claim of ineffective assistance of trial counsel.  If the petitioner fails, the analysis stops, and habeas relief is denied.  *Williams v. Superintendent Mahanoy SCI*, 45 F.4th 713, 723 (3d Cir. 2022). Only if the petitioner succeeds on the underlying claim of ineffective assistance of trial counsel does the Court moves to the question of procedural default.  *Id.*

The Court follows this analysis here, first addressing the merits of Mr. Black's claim of ineffective assistance of trial counsel, based on the current state court record.  Because the Court concludes that Mr. Black has not met his burden to show the ineffectiveness of his trial counsel based on the current state court record, the Court need not address whether his procedural default is excused.

### B.  Whether Mr. Black's Trial Counsel Was Constitutionally Deficient

A criminal defendant has a Sixth Amendment right to effective assistance of counsel. *Strickland v. Washington*, 466 U.S. 668, 684-86 (1984).  To successfully show ineffective assistance of counsel, Mr. Black must show (1) that counsel failed to exercise the level of skill and diligence that a reasonably competent attorney would exercise in a similar situation, and (2) that

he was prejudiced by counsel's failure. *Id.* at 687.[3] There is a strong presumption that defense counsel acted "within the wide range of reasonable professional assistance." *Id.* at 689. It is Mr. Black's burden, as the petitioner, to overcome that presumption. *Id.* "Judicial scrutiny of counsel's performance must be highly differential." *Id.* Furthermore, the Court must presume that challenged actions "might be considered sound trial strategy." *Id.*

To be sure, "the label 'trial strategy' does not automatically immunize an attorney's performance from sixth amendment challenges." *Kellogg v. Scurr*, 741 F.2d 1099, 1102 (8th Cir. 1984). There must always be a reasonable strategic reason or justification for counsel's actions. *Gabaree v. Steele*, 792 F.3d 991, 999 (8th Cir. 2015) (affirming the grant of habeas relief because "there was no reasonable strategic reason for counsel not to object to [testimony]."); *Simmons v. Luebbers*, 299 F.3d 929, 938 (8th Cir. 2002) ("Attorneys' actions cannot be considered a product of a reasonable trial strategy because there was no justifiable reason [for them]."). However, the burden is on the petitioner to prove otherwise by demonstrating that his attorney's representation was unreasonable under prevailing professional norms. *Strickland*, 466 U.S. at 688–689. Said differently, the petitioner must prove that any strategic justification for counsel's actions were unreasonable. Accordingly, the Sixth Amendment requires a reviewing court to "determine whether, in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance." *Id.*, at 690. The reasonableness of counsel's performance is to be evaluated from counsel's perspective at the time of the alleged error and in light of all the circumstances. *Id.*, at 689.

---

[3] To show prejudice, "the [petitioner] must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694.

The Court must also assess counsel's overall performance throughout the case to determine whether the "identified acts or omissions" overcome the presumption that a counsel rendered reasonable professional assistance. *Kimmelman v. Morrison*, 477 U.S. 365, 386, (1986). "Since '[t]here are countless ways to provide effective assistance in any given case,' unless consideration is given to counsel's overall performance, before and at trial, it will be "all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable." *Id.* (internal citation omitted).

At bottom, "[c]ounsel . . . has a duty to bring to bear such skill and knowledge as will render the trial a reliable adversarial testing process." *Strickland*, 466 U.S., at 688. "The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Id.* at 686.

Additionally, Mr. Back must prove that his counsel's deficient performance prejudiced him. To prove prejudice, Mr. Black must show that "there is a reasonable probability that, but for his counsel's unprofessional errors, the result of the proceeding would have been different." *Id.*, at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.*

Here, Mr. Black argues that his attorney was constitutionally deficient by failing to request an involuntary manslaughter jury instruction, a lesser-included offense for second degree murder. The Parties seem to agree that, had counsel requested an involuntary manslaughter instruction, the trial court would have been required to give it, as involuntary manslaughter is the nested lesser included offense of murder in the second degree. *See* Mo. Rev. Stat. § 565.029. Accordingly, the question turns to whether the decision not to request the involuntary manslaughter instruction was

unreasonable trial strategy. Mr. Black suggests that there are only two reasons trial counsel might not have requested an involuntary manslaughter instruction, and neither was reasonable: (1) trial counsel did not know Mr. Black was entitled to the involuntary manslaughter instruction; (2) trial counsel knew about the instruction but chose not to request it as a matter of strategy, which was "based on an objectively unreasonable assessment of petitioner's likelihood of an outright acquittal." Doc. 25, at 6.

### 1. Whether Trial Counsel's Decision Not to Request Lesser-Included Instruction Was Strategy

As discussed, Mr. Black did not present this claim of ineffective assistance of trial counsel in state post-conviction proceedings, accordingly, there is no explicit explanation for why trial counsel did not request an involuntary manslaughter instruction. Mr. Black argues that because the trial court record does not explain trial counsel's decision, the Court cannot assume that it was a tactical choice. *See* Doc. 14, at 10–11 (citing *Harris v. Reed*, 894 F.2d 871, 876 (7th Cir. 1990)). The Court disagrees. Not only can the Court presume that defense counsel's actions were motivated by his trial strategy, but it must. *Seehan*, 72 F.3d at 611; *see also Strickland*, 466 U.S. at 689 ("Because of the difficulties inherent in making the [deficiency] evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action "might be considered sound trial strategy."). Accordingly, the record need not definitively establish that defense counsel's actions were motivated by strategic considerations if the Court or the prosecution can identify a reasonable strategic motivation[4] for

---

[4] Of course, the Court cannot presume that just because an attorney acted in accordance with trial strategy, the action or strategy was itself reasonable. *Kellogg*, 741 F.2d at 1102. The Court's analysis must always and ultimately turn on whether counsel's overall performance, including any

the action. *Williams*, 45 F.4th at 724 (holding, after *Shinn*, that while prosecution failed to identify a strategic justification in the record for defense counsel's actions, "it [was] not difficult to identify one." (quotation omitted)); *cf. Preston v. Superintendent Graterford SCI*, 902 F.3d 365, 382 (3d Cir. 2018) (concluding that counsel's performance was deficient when neither the court nor the Commonwealth could identify an explanation for counsel's failure to raise an issue at trial). Indeed, binding Supreme Court precedent requires Mr. Black to prove that his attorney's actions *were not* sound strategy. *Kimmelman*, 477 U.S. at 384 ("[T]he defendant must rebut this presumption by proving that his attorney's representation was unreasonable under prevailing professional norms and that the challenged action was not sound strategy."); *see also Harrington*, 562 U.S. at 109 ("Although courts may not indulge post hoc rationalization for counsel's decisionmaking that contradicts the available evidence of counsel's actions, neither may they insist counsel confirm every aspect of the strategic basis for his or her actions. There is a strong presumption that counsel's attention to certain issues to the exclusion of others reflects trial tactics rather than sheer neglect.") (internal quotation marks omitted).[5]

Furthermore, trial counsel's testimony in state post-conviction proceedings provide enough evidence to conclude that refusing the lesser-included instruction was in fact part of trial counsel's

---

specifically challenged conduct, falls "outside the wide range of professionally competent assistance. *Harris*, 894 F.2d at 878.

[5] Mr. Black cites *Harris* to argue that the Court should not presume counsel's decisions to be motivated by strategy. *Harris v. Reed*, 894 F.2d 871, 878 (7th Cir. 1990). However, the Seventh Circuit has since repudiated *Harris's* suggestion that a habeas court should not "construct strategic defenses which counsel does not offer." *Id.* It did so by recognizing, as this Court has already discussed, that under *Strickland*, a court must begin its analysis with a strong presumption that counsel was not ineffective and that counsel's actions might have been sound trial strategy. *Meyers v. Gomez*, 50 F.4th 628, 645 (7th Cir. 2022). As the Seventh Circuit explained, "[f]or us to presuppose, when counsel is unavailable to explain his decision-making, that he had no strategic rationale for the particular choice at issue—when a choice clearly was made—would turn these presumptions on their head." *Id.*

strategy. Trial counsel explained that his strategy was to focus on Mr. Black's version of the events: that S.G. ultimately died from brain damage she suffered from a lack of oxygen caused by choking on a baby wipe, and any physical injuries were caused by that loss of oxygen or efforts to revive S.G. Doc. 9-8, at 40:12–21; 41:10–18. At core, that S.G.'s death was an accident. Trial counsel was insistent that he wanted to focus on Mr. Black's account, which had been consistent since the night of S.G.'s death and which was supported by Mr. Black's expert. Trial counsel testified that he wanted to avoid getting into any issue that could be a "red herring type thing[]" and distract the jury. Doc. 9-8, at 48:19–49:15. Put simply, Trial counsel wanted the jury to focus on Mr. Black's limited involvement and that S.G.'s death, while tragic, was not his fault.

Trial Counsel made tactical decisions because of this strategy. For example, he avoided trying to identify who or what caused S.G.'s older injuries, because, according to the prosecution's experts, they could not have caused her death. This is because whatever injury caused S.G.'s death would have been inflicted just before her death. Trial counsel believed that trying to identify the cause would have done little more than distract the jury from what Mr. Black said happened, which trial counsel believed did not support conviction. For the same reason, trial counsel chose not to suggest S.G.'s mother or father were at fault or involved in her death. Doc. 9-8, at 48:19–49:15 ("When I do a trial, I try to pick what I believe is the best argument and try to stick with that. Sure, you can demonize [S.G.'s biological mother]. Sure, you can demonize [S.G's biological father]. You can point out all sorts of things. But what ultimately I want the jury to focus on is what my theory of defense is. And my theory of defense in this case was Mr. Black's story was consistent from day one and it was consistent with the evidence as my expert portrayed it."). Mr. Black's expert, Dr. Young, testified that S.G.'s injuries were consistent with Mr. Black's consistent

account of S.G.'s death, and trial counsel believed he could undermine the testimony and credibility of the prosecution's experts who said otherwise.

At bottom, there is no indication trial counsel was unaware that he could request an involuntary manslaughter instruction, and the Court cannot simply presume that, because trial counsel did not ask for the instruction, he did not know that he could. As already explained, the Court must presume that trial counsel acted reasonably, and it is for Mr. Black to prove otherwise. Looking to the state court record, trial counsel pursued an all or nothing trial strategy. Foregoing an involuntary manslaughter instruction would have been consistent with that strategy. Furthermore, there is evidence that Mr. Black and his counsel did discuss lesser included offenses generally. Counsel and Mr. Black discussed the availability of a lesser included child abuse offense, and they discussed Mr. Black's decision to refuse that instruction. This suggests that trial counsel was aware that he could request jury instructions for nested lesser included offenses. On this record, Mr. Black has not met his heavy burden to show that proceeding without an involuntary manslaughter instruction was not a strategic choice by his attorney.

That being said, Respondent suggests that not only was the decision to proceed without a lesser-included instruction trial strategy, but it was also strategy ratified by Mr. Black. To do so, Defendant points to this colloquy between the state trial judge and Mr. Black:

Q.      Mr. Black, further there's an issue on instructions to the jury that I understand your attorney discussed with you yesterday afternoon; is that correct?

A.      That is correct.

Q.      That issue is that the State has proposed in an instruction as to the instructing the jury on finding you guilty under Count I of abuse of a child, causing serious physical injury. Do you understand that?

A.      Yes, sir, I understand that.

Q.      That's a Class B felony. You have a right to request a lesser included instruction that would be a Class C felony of abuse of a child with physical injury. Do you understand that?

A.     Yes, sir, I understand that.

Q.     Mr. Crowell announced yesterday that you had decided you wish to oppose any lesser included offense. Is that my understanding of your statement to the Court, Mr. Crowell?

A.     Yes, it is.

Q.     Mr. Black was that discussed with you?

A.     Yes, sir.

Q.     Did you consider all the points of view as to whether it would benefit you or hurt your case to submit the lesser included offense; is that correct?

A.     Yes sir, I thought about it.

Q.     Considering all that, what do you wish to do?

A.     I choose to keep it what it is now.

Q.     And not to submit the lesser included offense is that correct?

A.     Yes, sir, that is correct.

Q.     Again, that's after fully discussing the issue with your attorneys and considering their [advice] that you're making that decision; is that correct?

A.     Yes, sir, that is correct.

Q.     Mr. Crowell, do you agree with that decision of the defendant?

A.     I do agree with that, Judge.

Q.     and could you state - - without getting into attorney/client privilege, would you like to discuss on the record your thoughts on the matter as to why it would benefit your client?

A.     Judge, I'd rather not.

Doc. 29-3, at ECF 60–63.

Respondent points to this conversation to suggest that trial counsel and Mr. Black discussed *all* potential lesser-included offenses and made an informed strategic decision not to instruct the jury on any of them. While there is evidence in the record that suggests—and the Court must presume—that the decision not to request the involuntary manslaughter instruction was strategy, the Court cannot infer from this colloquy that Mr. Black and trial counsel *discussed* (and Mr. Black therefore ratified) refusing all potential lesser-included offenses. The statement from the trial judge that trial counsel "announced yesterday that you had decided you wish to oppose any lesser

included offense" is ultimately ambiguous. It could be read to indicate that trial counsel discussed, and Mr. Black refused, all the available lesser-included offenses, including involuntary manslaughter. But, because the trial judge exclusively discussed the lesser-included child abuse offense, trial counsel's discussion with Mr. Black could just as reasonably have been limited to only that instruction. After all, why would the trial judge make a record for only one lesser included offense if they were all discussed at the same time in the same conversation?[6] Just as Mr. Black cannot collect additional evidence to supplement the state Court record, Respondent cannot ask the Court to assume that additional evidence, an agreement by Mr. Black to proceed without an involuntary manslaughter instruction, exists. Especially because the lesser-included child abuse instruction does not relate to the mens rea requirement underlying the alleged abuse,[7] it would be a step too far to infer, given the state court record, that because Mr. Black decided to refuse one potential lesser-included offense, he knew about and intended to refuse them all.

### 2. Whether the Decision Not to Request an Involuntary Manslaughter Instruction was Reasonable

Whether to seek a lesser-included offense instruction can be, and often is, a strategic decision that requires even experienced attorneys to make difficult judgment calls. *Neal v.*

---

[6] Mr. Black does not appear to argue that trial counsel was ineffective for failing to inform him about, or to receive permission to proceed with, his decision to refuse a lesser-included involuntary manslaughter instruction. Even if he did, the strategic decision would have been trusted to the professional judgment of trial counsel. *See, e.g., Edwards v. Mack*, 4 Fed. Appx. 215, 217-18 (6th Cir. 2001) (holding that attorney could refuse lesser-included offense instruction even if he pursued his strategy without the defendant's permission because it constituted a proper exercise of counsel's judgment).

[7] The difference between involuntary manslaughter and second-degree murder is the *mens rea* required. Second degree murder requires proof that Mr. Black acted knowingly, while involuntary manslaughter requires only recklessness for conviction. The lesser-included child abuse instruction does not address *mens rea*, but rather the severity of the injuries a child suffers. Accordingly, by refusing the lesser-included child abuse instruction Mr. Black did not, even implicitly, refuse an instruction that would have given the jury the compromise option that Mr. Black now seeks.

*Acevedo*, 114 F.3d 803, 806 (8th Cir. 1997); *Waiters v. Lee*, No. 20-2190, 2021 WL 5183539, at *2 (2d Cir. Nov. 9, 2021) ("[W]hether or not to ask the trial judge to instruct the jury on lesser-included offenses is a matter of strategy and tactics." (citation omitted)).  Adopting an "all or nothing" defense could be a reasonable strategic decision by an attorney, even when it does not ultimately work.  *Riley v. Lockhart*, 726 F.2d 421, 423 (8th Cir. 1984).

Mr. Black was charged with child abuse and murder in the second degree for killing S.G. through the commission of a felony, the abuse.  The Missouri Supreme Court considers involuntary manslaughter a "nested lesser-included offense of second-degree murder because the only differential element between [the] two crimes is the heightened *mens rea* requirement [to convict for second degree murder]."  *Meiners v. State*, 540 S.W.3d 832, 838 (Mo. banc 2018).  "Involuntary manslaughter requires a showing of recklessness, while second-degree murder requires a higher showing of knowledge."  *Id.*  In Missouri, a trial court is "effectively required to instruct on nested lesser-included offenses if asked to do so."  *Id.*  Similarly, to prove child abuse, the prosecution must prove that the defendant knowingly caused injury to a child.  RSMo 568.060(2).

Mr. Black's defense theory was that S.G.'s death was an accident.  Doc. 1, at 16; Doc. 14, at 16; Doc. 27, at 11–13.  With these facts, Mr. Black's trial counsel adopted an "all or nothing" trial strategy, by which he argued that Mr. Black did not knowingly act to harm S.G. and therefore was not guilty of any crime.[8]

---

[8] Under Missouri Law, a defendant is guilty of second degree murder if he (1) "knowingly causes the death of another person or, with the purpose of causing serious physical injury to another person, causes the death of another person" or (2) "Commits or attempts to commit any felony, and, in the perpetration or the attempted perpetration of such felony or in the flight from the perpetration or attempted perpetration of such felony, another person is killed [.]" RSMo 565.021.

Mr. Black's story—that S.G., an eleven-month-old baby, balled up and pushed a baby wipe so far down her throat that it could not be seen or retrieved without pliers—is questionable at best, and the prosecution's evidence discrediting Mr. Black's story was substantial. For example, the prosecution's two medical experts not only contradicted Mr. Black's explanation for S.G.'s injuries, they believed it to be impossible. The experts testified to numerous fresh injuries on S.G.'s face—appearing on her chin, cheeks, ears, and forehead—that must have been caused shortly before S.G. was brought to the hospital. Furthermore, the medical experts, as well as the first responders present the night S.G. died, testified that these injuries were likely unrelated to S.G.'s medical care. *E.g.*, Doc. 9-3, at 5–7; Doc. 9-6, at 7–9. The experts squarely rejected that these injuries came from Mr. Black's fall while carrying S.G. or as a result of S.G.'s lack of oxygen from the baby wipe, as Mr. Black claimed. Furthermore, the prosecution's experts testified that S.G.'s brain injuries reflected multiple points of impact, produced by a rotational force, that was inconsistent with a fall or similar single blunt-force injury. Doc. 29-2, at ECF 73–74, 539:16–540:11. The experts testified that this injury would have immediately made it difficult to breathe, and S.G. would have lost consciousness very quickly. Doc. 29-2, at ECF 73–74, 539:16–540:11; Doc. 29-2, ECF 30–40, 496:23–506:25; Doc. 29-3, ECF 81, 645:4–12. What's more, Dr. Case testified that not only *would* an eleven-month-old baby not put a baby wipe in her mouth, as Mr. Black claimed, she *could* not—did not possess the finger dexterity to—ball it up and lodge it far enough down her throat to obstruct her breathing and be unreachable without pliers. Doc. 29-2, at ECF 85–86, 559:9–560:17.

While reasonable advocates could conclude that an all or nothing strategy in the face of such strong evidence and the inherent weaknesses in Mr. Black's story was ill-advised, the Court concludes that Mr. Black has not shown that trial counsel's representation was Constitutionally

deficient. *Harrington*, 562 U.S. at 105 ("The question is whether an attorney's representation amounted to incompetence under prevailing professional norms, not whether it deviated from best practices or most common custom." (internal quotation omitted)). This is for three reasons: <u>first</u>, trial counsel was able to prepare a case, supported by expert evidence, to reinforce the story Mr. Black repeatedly told, and made reasonable efforts to undermine the prosecution's case; <u>second</u>, there is an apparent inconsistency between Mr. Black's trial strategy to focus on Mr. Black's story and an involuntary manslaughter instruction, and <u>third</u>, while reasonable minds may disagree with trial counsel's decision, looking at the record, trial counsel's overall representation was not so deficient that it "undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Strickland*, 466 U.S. at 686.

### a. It Was Not Unreasonable for Trial Counsel to Believe That an All or Nothing Strategy Could Result in an Acquittal

First, given Mr. Black's version of the events and the weaknesses in the prosecution's case, it was not unreasonable to believe that a complete acquittal was possible. Trial counsel was effectively "stuck" with Mr. Black's story, which he had told multiple times to multiple people. Even if that story appeared somewhat improbable, trial counsel constructed a case to rebut the prosecution's position while supporting Mr. Black's own version of S.G.'s death. Taken together, it was not objectively unreasonable—even in the face of strong contradicting evidence—for a competent attorney to pursue an all or nothing strategy holding the prosecution to the heightened requirements of the more severe charges. *See Kelly v. Lazaroff*, 846 F.3d 819, 830 (6th Cir. 2017) (finding all or nothing strategy was not constitutionally deficient because even though there was strong evidence controverting the defendant's story, there was conceivably enough evidence from which the jury could believe the defendant's story rather than the prosecution's, making it not objectively unreasonable to take an all or nothing approach).

For example, trial counsel emphasized Mr. Black's lack of motive. While the prosecution relied on medical evidence to effectively suggest that Mr. Black violently attacked S.G.—causing the injuries that the prosecution's experts concluded indicated rotational force and multiple points of impact—trial counsel carefully explained that Mr. Black had no reason to do so. First, trial counsel used his cross examination of S.G.'s mother, R.G., to establish that Mr. Black and S.G. had a good relationship, that he would often care for her, and that S.G. appeared to like Mr. Black. Given the relationship, trial counsel emphasized for the jury how the picture of Mr. Black violently attacking S.G. in her room, with her mother just down the hall, painted by the prosecution, simply did not make sense.

In response, it appears the prosecution argued that S.G. was crying the night of her death, seemingly to suggest that S.G. provoked Mr. Black to lose his temper. But trial counsel explained that Mr. Black did not live with S.G. and her mother full time, and so if S.G. had been crying and disturbing Mr. Black, he simply could have left, or asked S.G.'s mother to take care of the situation. Doc. 29-3, at ECF 99, 663:8-18. S.G. was not ultimately Mr. Black's responsibility.

Trial counsel also used circumstantial evidence to bolster Mr. Black's story. For example, trial counsel, multiple times, reiterated that Mr. Black's story had been consistent from the night that he told it, and that Mr. Black did not have the time, or the ability, to realistically concoct and rehearse a fabricated story that would consistently stand up to police scrutiny. Trial counsel also noted that a balled up baby wipe and pliers were found in S.G.'s room, and the baby wipe had S.G.'s blood on it. Trial counsel questioned Dr. Case, who admitted that the blood could have come from cuts inside of SG.'s mouth, cuts that could have come from Mr. Black's attempts to remove the baby wipe with pliers.

Finally, trial counsel provided expert evidence to establish that S.G.'s death could have occurred as Mr. Black described, and he made arguments and engaged in cross examination to discredit the prosecution's experts. Mr. Black was supported by the testimony of Dr. Young. Dr. Young was the former chief medical examiner serving the Kansas City area, including Jackson, Platte, Clay, and Cass counties, for ten years. Doc. 29-3, ECF 10, 574:17–21. He was an assistant medical examiner before that, and he continued working as a medical consultant after he left his position as chief medical examiner. Dr. Young has performed over 5,000 autopsies in his career, hundreds of which have been on children. Doc. 29-3, ECF 12, 576:7-14. He also had testified as an expert witness many times for the prosecution, and continues to serve as an expert witness, often for defendants, through his consulting practice. What's more, Dr. Young frequently consulted with the Missouri Public Defender System. Dr. Young testified that hypoxia, a lack of oxygen to the brain, can cause the same brain damage that the prosecution's experts attributed to multiple physical impacts. Doc. 29-3, ECF 104–05, 668:7–669:25. This, testified Dr. Young, was because blood leaked from brain cells damaged by a lack of oxygen, rather than any specific impact. Doc. 29-3, ECF 114, 678:5–20. Dr. Young ultimately looked at the same evidence as the prosecution's experts, and highlighted for the jury that it could be interpreted multiple ways. *Id.*; *see also* Doc. 29-3, at ECF 19–22, 584:19–586:14.

To be sure, the prosecution's experts were both formidable. They were well-established, had outstanding credentials, and had many years of relevant experience. And they certainly disagreed with Dr. Young, testifying to serious flaws in the science underlying Dr. Young's opinion. The prosecution's experts argued that Dr. Young's position that cell damage caused by a lack of oxygen could have caused S.G.'s brain injuries was called into doubt—if not refuted— by the scientific literature and highlighted that two of the articles on which he relied had resulted

in disciplinary action against the authors in the United Kingdom. But this was ultimately a scientific dispute between experts. Dr. Young had extensive qualifications and experience, and was able to elaborate and defend his conclusions on both direct and cross examination. Doc. 29-3, ECF 23–32. Dr. Young acknowledged the criticisms levied by the prosecution and explained why they were not as damning as the prosecution claimed. Put simply, it is true that the prosecution attempted to paint Dr. Young as a fraud and hired gun, but trial counsel—and Dr. Young himself—were able to offer reasonable rejoinders to those claims to the jury.

Trial counsel further made reasonably calculated efforts to discredit the prosecution's experts through his cross examination and his closing argument. For example, trial counsel attempted to neutralize Dr. Case's interpretation of S.G.'s cause of death by highlighting that she was a 40-year advocate for children suffering from brain injuries caused by abuse. As a result, trial counsel suggested, Dr. Case was more likely to interpret findings in S.G.'s brain—which even Dr. Case admits can be caused by many things, not all of which involve traumatic injury—as resulting from child abuse. Doc. 29-3, at ECF 114–15. Indeed, on cross examination Dr. Case admitted that it was "not possible to know exactly what happened" the night S.G. died. Doc. 29-2, at ECF 74, 540:17–19. Furthermore, while Dr. Case testified that there was no relationship between hypoxia (the lack of oxygen to the brain) and bleeding in the brain, she admitted that she herself was involved in an ongoing study on that topic. Doc. 29-2, at ECF 67, 533:19–25. Trial counsel highlighted that fact for the jury during closing arguments. Doc. 29-3, at ECF 103–104, 667:23–668:6 ("If she knew for certain that hypoxia could not cause these types of injuries, why are her studies ongoing? Why is she continuing to study hypoxia?").

While the prosecution's other expert, Dr. Atzemis, testified that many of S.G.'s physical injuries were not consistent with Mr. Black's story, trial counsel was able to "poke holes" in that

conclusion.  For example, Dr. Atzemis admitted that many of the injuries to S.G.'s face, such as the various cuts and bruises on her body, could have been caused by efforts to resuscitate and intubate S.G. after she stopped breathing.  Doc. 29-3, at ECF 103–104, 667:5–668:5.  Trial counsel provided an alternative explanation.  He highlighted for the jury that that while first responders normally do not cause damage, it was understandable, given this situation, that the first responders could injure S.G in the heat of the moment and not remember or note those injuries, as they were focused on saving S.G.'s life in the heat of the moment.  Furthermore, trial counsel explained that Mr. Black, at the instruction of the 911 operator, attempted to resuscitate S.G. before first responders arrived.  This ultimately provided the jury with another explanation for S.G.'s injuries, given Mr. Black was in no way trained to provide emergency care to S.G.  Trial counsel also carefully showed through cross examination that Dr. Atzemis could only conclude that there was "reasonable cause" to believe that there had been abusive head trauma.  Reasonable cause is a lower standard, and in this case, Dr. Atzemis could not conclude using the higher "definitive four" standard that there had been abuse.  Doc. 29-1, at ECF 151, 389:1–18, ECF 161–62, 399:24–400:6. Taken together, trial counsel gave the jury an explanation for S.G.'s injuries that did not suggest Mr. Black attacked S.G. randomly and violently in the middle of the night, as the prosecution suggested.

Finally, while Dr. Case testified that it would be unlikely, if not impossible, for S.G. to get a baby wipe into her throat as Mr. Black claimed, trial counsel thought that he could convince the jury that she was wrong.  Doc. 9-8, at ECF 18–20, 54:2–56:4.  Trial counsel attempted to undermine Dr. Case's testimony by noting that the box of baby wipes itself had a choking hazard warning on it.  Trial counsel appeared to use that testimony to appeal to the jury's common experience with babies, arguing that a baby will put anything in her mouth, and that there is a

reason caregivers try to keep small objects away from babies: because they can choke. Trial counsel believed that this line of questioning undermined Dr. Case's credibility to the jury, given his general experience with the way juries understand and rely upon expert evidence, and his experience with that specific jury on voir dire. *Id.*; *see also* Doc. 29-3, at ECF 105–106, 669:17–670:5 (closing argument addressing jury's common experience suggesting babies put many things they should not in their mouths).

At bottom, given the facts and trial counsel's efforts to discredit the prosecution's position, it was not unreasonable for trial counsel to believe that an all or nothing strategy was Mr. Black's best chance of acquittal.[9]

### b. An Involuntary Manslaughter Instruction Contradicted with Trial Counsel's Strategy and Undermined Mr. Black's Credibility

Second, it is not ineffective assistance to forego a lesser included jury instruction when that instruction would be inconsistent or incompatible with reasonable trial strategy. *Neal v. Acevedo*, 114 F.3d 803, 806 (8th Cir. 1997); *Burrell v. Bowersox*, No. 4:16-CV-00023-ERW, 2019 WL

---

[9] The jury twice reported to the judge that they were deadlocked and could not reach a decision. Doc. 9-3, at 89-90. Additionally, during the deliberations the jury asked for the definition of murder in the second degree and if they could convict on a lesser charge. *Id.* at 83. This evidence is ultimately not relevant to the reasonableness of trial strategy, given it is assessed from trial counsel's perspective at the time it was adopted. That said, the jury's questions do not unambiguously suggest that the all or nothing strategy was incompetent. At bottom, the questions demonstrate that the jury struggled to convict Mr. Black of murder in the second degree, and that the jury was open to convicting Mr. Black of a lesser charge. But even so, the jury just as well could have acquitted Mr. Black, given their belief that he should be guilty of a less severe offense, but not the crime charged. This suggests that trial counsel's strategy was not immediately discarded by the jury. At bottom, the jury's questions do not rebut the presumption that trial counsel's strategy was reasonable. *Illescas v. Lee*, No. 11-CV-5835, 2013 WL 1247513, at *9–10 (E.D.N.Y. Mar. 26, 2013) (finding that jury's question about convicting of a lesser charge, while ultimately irrelevant to reasonableness of trial strategy, did not suggest an incompetent strategy. This because even though the evidence might support a lesser offense, reasonable counsel could still conclude that it was unlikely the jury would convict on the higher charge, rather than acquit altogether).

1275013, at *3 (E.D. Mo. Mar. 20, 2019) ("It would not have made sense to pursue an innocence defense and assert Petitioner should be found guilty of voluntary manslaughter."); *Kubat v. Thieret*, 867 F.2d 351, 364-65 (7th Cir. 1989) (concluding that counsel's decision not to request a lesser-included offense instruction in a kidnapping case was reasonable in light of the defendant's alibi defense). Here, an involuntary manslaughter instruction would have been inconsistent with Mr. Black's position that S.G.'s death was an accident that he did not cause. *Otero v. Eisenschmidt*, 01-cv-2562, 2004 WL 2504382, at *33 (S.D.N.Y. Nov. 8, 2004) (a strategy that denies guilt is "a strategy that practically precludes a request for an instruction on a lesser included offense") (internal quotation marks omitted). To begin, submitting involuntary manslaughter to the jury could have undermined Mr. Black's version of S.G.'s death. Trial counsel argued that all Mr. Black knew was that when he checked on S.G., she was not breathing. Put technically, Mr. Black's story suggested that he had neither the necessary *actus reus* (action constituting a crime) nor *mens rea* (culpable mental state motivating that action) to be guilty of a crime. Against that background, it was not unreasonable to believe that suggesting to a jury that they could find that Mr. Black in fact did *something* to harm S.G., but he just did not have the appropriate mental state to be guilty of the more severe crime charged, would undermine Mr. Black's defense and credibility. *Martin v. Norman*, 4:18-cv-00427, 2019 WL 3238506, at *7 (E.D. Mo. July 18, 2019) ("Therefore, when the 'all or nothing' defense theory of innocence is presented at trial, a decision by counsel not to request a lesser-included offense instruction is a reasonable strategy. Because the defense theory presented here was that Movant had not committed child molestation at all, counsel was not ineffective for deciding not to request the instruction for second-degree child molestation."); *Dixon v. Burt*, 206-CV-12807, 2007 WL 1424218, at *3 (E.D. Mich. May 11, 2007) (finding that an accidental shooting defense, in which petitioner claimed he dropped his gun,

causing it to fire two bullets that both hit his girlfriend, was inconsistent with an involuntary manslaughter lesser-included offense instruction); *Anderson v. Rewerts*, 2:19-CV-10655, 2019 WL 5422978, at *5 (E.D. Mich. Oct. 23, 2019) ("In light of the fact that petitioner's primary defense strategy was to deny that he intended to kill or harm the victims in any way, it was a reasonable trial strategy for counsel to forego requesting an instruction on the lesser included offenses of third and fourth-degree child abuse[.]"). This is especially true because requesting the lesser-included instruction would have left the jury with the only other explanation presented to them: that Mr. Black knowingly attacked S.G., as the prosecution suggested.

Mr. Black argues that there is no "fundamental inconsistency between an accident defense and an 'incomplete' reckless conduct defense to a murder charge." Doc. 14, at 11. And, on a "fundamental" level, that may be true. But the issue must always turn on the facts of the case. Mr. Black points to accidental shootings cases in which both accident and involuntary manslaughter were presented together. But in such cases, the cause of an injury is not disputed; for example, even in an accidental shooting, a gunshot killed the victim. *Id.*; *see also*, *e.g.*, *Watts v. Roper*, No. 4:03-CV-526, 2006 WL 2708630, at *2 (E.D. Mo. Sept. 20, 2006) (offering involuntary manslaughter instruction when criminal defendant stabbed victim, but claimed that it was accidental). Here, Mr. Black's actions, as he presented them, are not consistent with an involuntary manslaughter charge since he denies that he took any action that caused S.G.'s death. *Tinsley v. Million*, 399 F.3d 796, 808 (6th Cir. 2005) (finding counsel not ineffective for not requesting instructions relating to self-defense and the lesser included offenses of first-degree and second-degree manslaughter where counsel's "primary line of defense was that [defendant] was not the shooter[.]"). Indeed, it is not clear to the Court what action Mr. Black suggests the jury could find that he undertook recklessly that resulted in S.G.'s death. To submit the involuntary manslaughter

instruction to the jury, especially without an explanation or alternative, trial counsel would effectively concede to the jury that they could find from the facts that Mr. Black did *something*, such as shaking S.G. This could have severely undermined Mr. Black's story and the strategy that trial counsel built from it. *Samuels v. Bennett*, No. 03-CV-2340, 2009 WL 2516850, at *24 (S.D.N.Y. Aug. 17, 2009) ("Further, had [trial counsel] pursued the argument that [petitioner criminal defendant] might have been guilty only of manslaughter . . . he may well have severely undermine[d] his basic argument that petitioner should not be found guilty of any crime." (internal quotations omitted)); *Smith v. Walsh*, No. 02-cv-5755, 2003 WL 21649485, at *7 (S.D.N.Y. July 14, 2003) (finding it reasonable to not request a lesser included offense that undermines the petitioner's testimony); *see also Love v. State*, 670 S.W.2d 499, 502 (Mo. 1984) ("An offer of such an instruction would be out of phase with trial strategy, which was that defendant was innocent of anything—not that the homicides were manslaughter.").

As the Court has already discussed, some attorneys may have requested the involuntary manslaughter instruction as a "fallback position," believing that the jury would assume Mr. Black did *something* to harm S.G. given the strength of the prosecution's case and the fact that, from his story, only he had access to S.G. before she died. But this is not a case in which the defendant's own testimony guarantees his conviction, suggesting that a compromise option is necessary. *Cf United States ex rel. Barnard v. Lane*, 819 F.2d 798 (7th Cir. 1987) (finding ineffective assistance in murder trial where trial counsel did not request a justification and manslaughter instructions because defendant testified to loading his gun anticipating trouble with three men he knew and then shooting one of those three men in the chest; this left the defendant with no defense other than a hope that the jury would not follow instructions and convict on the charge presented; reasoning that an all or nothing strategy on those facts amounted to providing no defense at all). To the

contrary, it was not unreasonable for trial counsel to believe an all or nothing strategy would make it more difficult for the jury to convict Mr. Black at all, given the higher standards demanded by the more severe offenses charged by the prosecution and what trial counsel believed to be inconclusive evidence. *Adams v. Bertrand*, 453 F.3d 428, 435–36 (7th Cir. 2006) (finding that counsel's failure to seek jury instruction for lesser included offense of third-degree sexual assault in second-degree sexual assault prosecution was reasonable trial strategy because allowing main offense to stand on its own would make it more difficult for government to prove its case given weakness of evidence on force element of main offense).  The Court cannot say that, sitting in trial counsel's shoes at the time he was defending Mr. Black, that no reasonable attorney would believe—that it was *incompetent* under prevailing professional norms to believe—that an all or nothing strategy could lead to an outright acquittal, and an involuntary manslaughter instruction could undermine that strategy. *Adeyanju v. Richardson*, 448 F. Supp. 3d 984, 997–98 (W.D. Wis. 2020) (finding decision not to request lesser included instruction of reckless endangerment was reasonable given "petitioner here neither testified nor admitted to being present at the shooting, and his counsel principally argued to the jury that it should acquit on the ground that he was not there.  Although his 'not present' defense may have been weak, the jury still had the choice to accept it and acquit him if it had reasonable doubt about his presence.") *aff'd sub nom*. *Adeyanju v. Wiersma*, 12 F.4th 669 (7th Cir. 2021); *see also Harrington*, 562 U.S. at 105 ("The question is whether an attorney's representation amounted to incompetence under prevailing professional norms, not whether it deviated from best practices or most common custom." (internal quotation omitted)).

### c.  Trial Counsel's Overall Performance Also Defeats Mr. Black's Claim of Ineffective Assistance

Third, looking to the record as a whole, trial counsel's decision to pursue an all or nothing

strategy did not "undermine[] the proper functioning of the adversarial process [such] that the trial cannot be relied on as having produced a just result." *Strickland*, 466 U.S. at 686. The Supreme Court has directed courts evaluating ineffective assistance claims to be guided by the underlying purpose of the Sixth Amendment: ensuring a fair trial. *Id.* For that reason, "it will generally be appropriate for a reviewing court to assess counsel's overall performance throughout the case in order to determine whether the 'identified acts or omissions' overcome the presumption that a counsel rendered reasonable professional assistance." *Kimmelman*, 477 U.S. at 386. Without considering counsel's overall performance, both before and during trial, it would be "all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable." *Id.* (quotation omitted).

While Mr. Black can question—with the benefit of hindsight—whether pursuing an all or nothing strategy was the best way forward, the record objectively demonstrates that trial counsel was diligent and carefully formulated and implemented his trial strategy to defend Mr. Black. The record demonstrates thorough cross examinations, some of which the Court has already discussed, that achieved the points trial counsel identified as important. For example, trial counsel established that (1) the prosecution's timeline did not match the medical evidence; (2) that S.G. and Mr. Black had a good relationship, suggesting Mr. Black had no motive to harm S.G.; (3) that it was possible that some of S.G.'s injuries could have come from the efforts to resuscitate her; (4) that there were multiple interpretations of the medical evidence, one of which that supported Mr. Black's story; and (5) that even Dr. Case continued to study whether, as Mr. Black's expert suggested, hypoxia could cause the types of injuries that S.G. suffered. Not only did trial counsel elicit this testimony, he weaved it together during his closing argument to support Mr. Black. There is nothing in the record that suggests that trial counsel's representation effectively left Mr. Black without an

advocate, thereby undermining the integrity of the trial.

***

It is true that a lesser included involuntary manslaughter instruction could have presented the jury with a "compromise" position, which could have resulted in less jail time for Mr. Black. But, "that tactic . . . while it might ensure a smaller prison sentence, would also increase the chance of conviction on some charge." *Adams*, 453 F.3d at 435. Of course, with the benefit of hindsight and the knowledge that the jury obviously did not believe Mr. Black's story, it is easy to second guess trial counsel's balancing of the risks. But, as discussed throughout this Order, analyzing trial counsel's decision at the time he made it, counsel's decision was not unreasonable. *Domingo v. Greiner*, 99-CV-1906, 2002 WL 362761, at *2 (S.D.N.Y. Mar. 5, 2002) ("While with hindsight, counsel's decision not to seek a lesser included offense charge did not prove successful, his decision not to give the jury an option that could result in a compromise verdict was not unreasonable . . . . Counsel's decision not to pursue this dangerous strategy was well within the range of tactical strategy that is left to the professional judgment of defense counsel, and there is a 'strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.'") (quoting *Strickland*, 466 U.S. at 689).

### C. Whether a Certificate of Appealability Should Issue

Habeas petitioners proceeding under § 2254, like Mr. Black, are not automatically entitled to an appeal when their petitions are denied. They may do so only if the district court issues a certificate of appealability. 28 U.S.C. § 2253(c)(1)(A). The Court may only issue a certificate of appealability when the petitioner "has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). "A substantial showing is a showing that [the] issues are debatable among reasonable jurists, a court could resolve the issues differently, or the issues deserve further proceedings." *Cox v. Norris*, 133 F.3d 565, 569 (8th Cir. 1997). This is a low bar; a claim can be

considered debatable even if the Court believes that every reasonable jurist would agree that a petitioner will not ultimately prevail. *Miller-El v. Cockrell*, 537 U.S. 322, 337-38 (2003) ("A prisoner seeking a COA must prove something more than the absence of frivolity or the existence of mere "good faith" on his or her part. We do not require petitioner to prove, before the issuance of a COA, that some jurists would grant the petition for habeas corpus. Indeed, a claim can be debatable even though every jurist of reason might agree, after the COA has been granted and the case has received full consideration, that petitioner will not prevail").

Although this Court denies Mr. Black's habeas petition, he has sufficiently shown that he is entitled to a certificate of appealability. First, while this Court concludes that proceeding with an "all or nothing" trial strategy was debatable—but not incompetent—under professional norms, reasonable jurists could disagree, and therefore decide the issue another way. Mr. Black may therefore appeal the Court's conclusion that trial counsel's decision to proceed with an "all or nothing" trial strategy in the face of the evidence against Mr. Black was not ineffective assistance of counsel. Second, because *Shinn v. Ramirez*, 142 S. Ct. 1718 (2022), fundamentally altered the ability of the district court to expand the record in habeas proceedings, Mr. Black may, if he chooses to, appeal the Court's conclusion that he is not entitled to an evidentiary hearing to substantiate his Sixth Amendment claim.

## IV. CONCLUSION

In sum, given the evidence trial counsel gathered to support Mr. Black's case, the inconsistency between an involuntary manslaughter instruction and Mr. Black's story, and the skill and effort trial counsel brought to bear in Mr. Black's defense, Mr. Black has failed to show that it was unreasonable to proceed with an all or nothing defense.[10] As a result, the Court DENIES

---

[10] Because the Court finds that Black has not met his burden of proof to show incompetence, the

Mr. Black's writ of habeas corpus. However, the Court GRANTS Mr. Black a certificate of appealability as to the two issues identified above.

/s/ Nanette K. Laughrey
NANETTE K. LAUGHREY
United States District Judge

Dated: 12/30/2022
Jefferson City, Missouri

---

Court does not reach the question of prejudice. *Strickland*, 466 U.S. at 697 ("A court deciding an ineffective assistance claim [need not] ... address both components of the inquiry if the defendant makes an insufficient showing on one.").